In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-04-00173-CR


______________________________




STEPHON WALTER, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 5th Judicial District Court


Bowie County, Texas


Trial Court No. 03F0757-005




 




Before Morriss, C.J., Ross and Carter, JJ.


Opinion by Chief Justice Morriss



O P I N I O N



 Standing at the open side door of the almost deserted Outback Steakhouse in Texarkana late
on the evening of August 31, 2003, Richard Markeil Henson held a bag containing approximately
$800.00, which Stephon Walter (1) had taken from inside the restaurant and handed to Henson. Walter,
after handing Henson the money--but still possessing a handgun Walter had borrowed for the
purpose of robbing the restaurant--disappeared again into the restaurant, where three restaurant
employees awaited. Henson next heard, through the open door, the employees begging for their
lives--and then the sound of six gunshots. The three employees--general manager, Matthew Hines;
manager and expectant mother, Rebecca Shifflett; and systems manager, Chrystal Willis--were shot
and died where they lay.

 Later, as Walter and Henson left the restaurant grounds with the money and the gun, they
were the only two people alive who knew what had happened. But each of them told others.

 Walter told Billy Ray Johnson, who claims to be the common-law husband of Walter's sister. 
According to Johnson's testimony, between 1:00 and 2:00 a.m. on September 1, Walter sought a
private conversation with Johnson to discuss what had happened at the restaurant a short time
earlier. (2) 

 Henson,  on  the  other  hand,  told  his  brother,  Roderick,  the  following morning,
September 1. Roderick testified that Henson told him about the events occurring August 31 at the
restaurant. (3) 

 Both Walter and Henson were charged with capital murder in connection with the highly
publicized murders. The trial court transferred Walter's case to Collin County due to the extensive
publicity of the murders. The Collin County jury found Walter guilty of capital murder and assessed
punishment at life in prison. The trial court sentenced Walter accordingly.

 We affirm the trial court's judgment based on the following holdings on Walter's points of
error:

(1) The trial court did not abuse its discretion by admitting testimony regarding
statements by Henson that implicated both Henson and Walter.


(2) The trial court did not abuse its discretion when it excluded evidence of witness
Johnson's prior murder and robbery convictions as impeachment.


(3) The trial court did not abuse its discretion by changing venue to Collin County, a
county which lies outside any judicial district adjoining the Fifth Judicial District.


(4) The trial court did not err when it denied Walter's motion to quash the indictment
when the record shows that unauthorized people were present during grand jury
proceedings.


(5) The trial court did not err when it granted the State's challenges for cause concerning
five jurors who expressed that they would hold the State to a higher standard of proof
in a case in which the death penalty is sought.


(6) The trial court did not err when it refused to include an instruction on aggravated
robbery.

(1) The Trial Court Did Not Abuse Its Discretion by Admitting Evidence Regarding Henson's
Statements

 As we have mentioned above, Henson's brother, Roderick, testified at trial to various things
Henson told him about the August 31 events at the Outback Steakhouse. Walter objected to
Roderick's testimony in terms of both hearsay and a violation of the Sixth Amendment's
Confrontation Clause. We first address his Confrontation Clause argument.

 (a) Crawford Not Applicable to Nontestimonial Statements

 We first look at Walter's argument in terms of the Crawford rule: testimonial statements of
a witness who does not appear at trial are inadmissible unless that witness was unavailable to testify
and the defendant had a prior opportunity for cross-examination. See Crawford v. Washington, 541
U.S. 36, 68 (2004). We are aware that Crawford does impose restrictions in the application of
certain hearsay exceptions. However, a major limitation of Crawford is that its application is limited
to ''testimonial statements.''

 Although the Crawford opinion does not provide a comprehensive definition of ''testimonial,''
it does indicate that the term covers ''ex parte in-court testimony or its functional equivalent . . .
extrajudicial statements contained in formalized testimonial materials'' such as ''prior testimony at
a preliminary hearing, before a grand jury, or at former trial; and . . . police interrogations.'' Id. at
52. While there is no indication that these examples represent an exhaustive list, Crawford's
description lends support to our previous reading of Crawford that ''testimonial statements'' share
the characteristics of involving a declarant's knowing responses to structured questioning in an
investigative environment or courtroom setting where the declarant could reasonably expect that his
or her responses might be used in future judicial proceedings. See Wiggins v. State, 152 S.W.3d 656,
659 (Tex. App.--Texarkana 2004, pet. ref'd) (holding Crawford did not apply to statements against
interest made by coconspirator to declarant's supposed friends; such statements nontestimonial).

 The United States Supreme Court recently provided further guidance regarding statements
that are considered "testimonial" for purposes of Crawford. See Davis v. Washington, ___ U.S. ___,
126 S.Ct. 2266, 2273 (2006). The Court compared the statements found to be testimonial in
Crawford to the statements in the Davis case and concluded that the portion of a 9-1-1 call at issue
in Davis was nontestimonial. Davis, 126 S.Ct. at 2277. The Court pointed out that the declarant in
Davis made the statements at issue during a crime in progress and for the purpose of summoning
help. (4) Id. at 2276. The Court also observed that the declarant made the statement while still in a
dangerous setting and in a frantic state of mind, rather than in the safety of a police interview room
or another place of safety. Id. at 2277. So, from Davis, we learn that the timing, purpose, and setting
of the statement can be relevant considerations when determining whether the statement is
testimonial for the purpose of analysis under Crawford.

 Here, Roderick's testimony shows that the conversation involved only the two brothers and
took place at Henson's residence. Henson made the statements to his brother spontaneously and
apparently in an attempt to enlist his brother's help in eluding identification. It seems that Henson
spoke quite nervously with Roderick in an attempt to avoid ever being connected to the crime,
leading us to conclude that Henson did not make these statements under circumstances from which
a reasonable person might expect the statements to be used in a later criminal trial. Whatever the
precise definition of "testimonial statements," it is clear that, here, coconspirator Henson's remarks
in a private conversation with his brother only hours after the murders are not "testimonial
statements" and, thus, fall outside Crawford's analysis. Henson "simply was not acting as a witness"
when he spoke to his brother. See Davis, 126 S.Ct. at 2277.

 Several courts, including this one, have held that nontestimonial statements are still governed
by Ohio v. Roberts, 448 U.S. 56 (1980). See Wiggins, 152 S.W.3d at 660 (citing United States v.
Saget, 377 F.3d 223, 228 (2d Cir. 2004); Horton v. Allen, 370 F.3d 75, 84 (1st Cir. 2004); People
v. Cage, 15 Cal. Rptr. 3d 846 (Cal. Ct. App. 2004); State v. Manuel, 685 N.W.2d 525 (Wis. Ct. App.
2004)). Under Roberts, the introduction of a hearsay statement was permitted if it had sufficient
''indicia of reliability.'' See Crawford, 541 U.S. at 52; Roberts, 448 U.S. at 66; Wiggins, 152 S.W.3d
at 660. A hearsay statement is per se reliable under the Confrontation Clause if it falls within a
"firmly rooted" exception to the hearsay rule. White v. Illinois, 502 U.S. 346, 356 (1992).

 (b) Firmly-Rooted in Statement Against Penal Interest Exception

 Roderick's testimony concerns Henson's out-of-court statements offered "to prove the truth
of the matter asserted," that Walter committed the crime. See Tex. R. Evid. 801(d), 802. All seem
to agree that this testimony is hearsay. We must determine whether it fits into an exception to the
rule excluding hearsay--here, the statement against penal interest exception. Rule 803 provides a
definition of a statement against interest:

 A statement which was at the time of its making so far contrary to the declarant's
pecuniary or proprietary interest, or so far tended to subject the declarant to civil or
criminal liability, or to render invalid a claim by the declarant against another, or to
make the declarant an object of hatred, ridicule, or disgrace, that a reasonable person
in the declarant's position would not have made the statement unless believing it to
be true. In a criminal case, a statement tending to expose the declarant to criminal
liability is not admissible unless corroborating circumstances clearly indicate the
trustworthiness of the statement.


Tex. R. Evid. 803(24). As we pointed out in Wiggins, the Texas Court of Criminal Appeals has
found  statements  against  one's  penal  interest  to  be  "extremely  reliable."  See  Dewberry  v.
State, 4 S.W.3d 735, 753 (Tex. Crim. App. 1999).

 (i) Sufficiently Self-Inculpatory

 An admission against a codefendant declarant's interest can be admissible against the
defendant so long as it is sufficiently against the declarant's interest to be reliable. See Williamson
v. United States, 512 U.S. 594, 603 (1994); Dewberry, 4 S.W.3d at 751; Cofield v. State, 891 S.W.2d
952, 956 (Tex. Crim. App. 1994). At issue in Dewberry was testimony concerning statements made
to third parties by appellant's brother/codefendant, Chris Dewberry. See Dewberry, 4 S.W.3d at 751. 
The Texas Court of Criminal Appeals concluded that testimony regarding Chris' statements were
admissible against defendant John Dewberry because such statements using "we" sufficiently
implicated Chris in the commission of capital murder. See id. Due to the self-inculpatory nature of
the statements, the Dewberry court characterized the statements as reliable. See id.

 Here, we examine similar testimony regarding Henson's statements to his brother. While it
is true that Henson's statements seem to depict him as the less culpable one, by making such
statements, Henson opened himself to criminal liability at least for robbery, based on the admitted
original purpose for Henson and Walter being at the restaurant that night.

 Where a defendant conspired (5) to commit robbery that resulted in the murder of a sheriff's
deputy, the Fourteenth Court of Appeals affirmed a capital murder conviction based on liability
under Section 7.02(b) even when the defendant was not present at the scene of the murder. See
Longoria v. State, 154 S.W.3d 747, 755 n.6 (Tex. App.--Houston [14th Dist.] 2004, pet. ref'd). The
Longoria court concluded that it should be anticipated that a murder would occur where evidence
shows the defendant is aware that cohorts in a planned robbery are armed with guns. See id. at
756-57 n.7; see also Cienfuegos, 113 S.W.3d at 489-90 (holding evidence legally sufficient to
support capital murder conviction based on Section 7.02(b) when, after participating in kidnapping, 
appellant kept watch over kidnapped victims while coconspirator went elsewhere and fatally shot
deceased); Williams v. State, 974 S.W.2d 324, 330 (Tex. App.--San Antonio 1998, pet. ref'd)
(finding evidence factually sufficient to support capital murder conviction when jury could infer
from evidence appellant knew at least one person involved in robbery was carrying gun and,
therefore, record supported conclusion that murder reasonably foreseeable).

 Here, by Henson's account, Walter drove the two men to and from the restaurant with the
intent to commit aggravated robbery. The record suggests that, all the while, Henson knew that their
plan was to commit robbery and that Walter had a loaded gun. Even though Henson may not have
planned to actively participate in capital murder, the record supports the conclusion that his
utterances were statements against his penal interests and were sufficiently self-inculpatory.

 (ii) Sufficient Corroboration of Statement

 No definitive test exists by which to gauge the existence of corroborating circumstances for
purposes of Rule 803(24). See Davis v. State, 872 S.W.2d 743, 749 (Tex. Crim. App. 1994); Lester
v. State, 120 S.W.3d 897, 901 (Tex. App.--Texarkana 2003, no pet.). The burden lies with the party
seeking to admit the statement, and the test is not an easy one; the evidence of corroborating
circumstances must clearly indicate trustworthiness. Davis, 872 S.W.2d at 749. Any number of
factors may be considered in this inquiry, including: (1) whether the guilt of the declarant is
inconsistent with the guilt of the defendant, (2) whether the declarant was so situated that he or she
might have committed the crime, (3) the timing of the declaration, (4) the spontaneity of the
declaration, (5) the relationship between the declarant and the party to whom the statement was
made, and (6) the existence of independent corroborating facts. See Dewberry, 4 S.W.3d at 751. 

 Henson's admission to his brother regarding his involvement with the murders is not
inconsistent with Walter's guilt. According to Henson, they both entered the restaurant with the
intent to commit aggravated robbery. As discussed, the law will then apply to these facts to make
Henson criminally responsible for capital murder. However, Henson's guilt with respect to these
crimes does not lend itself to a conclusion that Walter is not guilty. In fact, only by implicating
Walter in the murders does Henson make himself criminally responsible. 

 Testimony of several relatives and acquaintances place Henson in the company of Walter the
night of August 31. Henson and Walter left together late that night, making both of them clearly
situated where they could have committed the crime. Henson told his brother that he was present
at the Outback Steakhouse that night and had plans of participating in the robbery. 

 Additionally, the timing of Henson's statement to his brother lends itself to the
trustworthiness of Henson's statements. The brother, Roderick, testified that, when he spoke with
the nervous-acting Henson the morning after the murders, Roderick had not yet heard anything about
the murders. At that point in time, Henson was not considered a suspect in the murders. Henson
contacted Roderick and spontaneously offered the information. That is, Henson spontaneously
offered the information and did not divulge the information simply in response to any questioning
or suspicion. The fact that Henson spoke with his brother so soon after the murders suggests that
Henson was upset and panicked, also lending to the trustworthiness of the statement. 

 Also relevant is the fact that Henson chose to speak to his older brother, a figure who would
typically be sought for guidance or help. Generally, a statement is sufficiently trustworthy for
purposes of Rule 803(24) when the statement is made to a relative. See Lester, 120 S.W.3d at
901-02; White v. State, 982 S.W.2d 642, 648 (Tex. App.--Texarkana 1998, pet. ref'd). In Lester,
we pointed out that the Texas Court of Criminal Appeals had arrived at a similar conclusion when
the appellant's out-of-court statements were at issue:

 It should also be noted that the statements were made in the presence of appellant's
brother . . . and his sister-in-law and thus the speakers reasonably felt they could
confide in them and had no motivation to lie or place the blame for the crime on
someone else. 

Therefore, we consider the fact that Henson spoke privately to his brother about the murders as a
factor lending itself to the trustworthiness of the statement.

 There is also independent evidence of the statement's trustworthiness. The State produced
pictures of the barbeque pit in which Henson and Roderick burned the clothing to alleviate Henson's
concerns about identification from surveillance. The State also introduced pictures of the money
recovered in an amount and location consistent with Henson's account of the robbery and murders. 
We conclude the relevant factors clearly point to the trustworthiness of Roderick's testimony.

 Since Henson's statements implicate him in capital murder and since the record provides
significant corroboration that clearly indicates the trustworthiness of Henson's statements to his
brother, we conclude that the trial court did not abuse its discretion by admitting Roderick's
testimony regarding those statements. We overrule Walter's contentions to the contrary. 

(2) The Trial Court Did Not Abuse Its Discretion by Excluding Certain Prior Convictions of 
Witness Johnson as Impeachment


 Also as we have mentioned above, Johnson testified to various admissions and actions by
Walter before, during, and after the events at the restaurant. During his trial testimony, Johnson was
questioned regarding his substantial criminal history, including a 1985 sexual assault conviction, a
1992 drug-related conviction, and a 1992 possession of a firearm by a felon conviction. However,
the trial court did not allow Walter to inquire into Johnson's 1988 convictions for second-degree
murder and aggravated robbery, concluding that such evidence was more prejudicial than probative. 
Walter argues the trial court abused its discretion by excluding this evidence. 

 Rule 609 governs the admission of prior convictions as impeachment evidence:

 (a) General Rule. For the purpose of attacking the credibility of a witness,
evidence that the witness has been convicted of a crime shall be admitted if elicited
from the witness or established by public record but only if the crime was a felony
or involved moral turpitude, regardless of punishment, and the court determines that
the probative value of admitting this evidence outweighs its prejudicial effect to a
party.


 (b) Time Limit. Evidence of a conviction under this rule is not admissible
if a period of more than ten years has elapsed since the date of the conviction or of
the release of the witness from the confinement imposed for that conviction,
whichever is the later date, unless the court determines, in the interests of justice, that
the probative value of the conviction supported by specific facts and circumstances
substantially outweighs its prejudicial effect.

Tex. R. Evid. 609. The decision to admit or exclude remote convictions under Rule 609 is within
the trial court's discretion. Theus v. State, 845 S.W.2d 874, 876 (Tex. Crim. App. 1992).

 We, therefore, review for an abuse of discretion the trial court's decision that the probative
value of admitting evidence of the 1988 convictions did not outweigh its prejudicial effect. (6)
 To
determine whether the probative value of the evidence outweighs the prejudicial effect, we look to
the Theus factors: 

 (1) the impeachment value of the prior crime, (2) the temporal proximity of the past
crime relative to the charged offense and the witness' subsequent history, (3) the
similarity between the past crime and the offense being prosecuted, (4) the
importance of the . . . testimony, and (5) the importance of the credibility issue.

See id. at 880; Woodall v. State, 77 S.W.3d 388, 395 (Tex. App.--Fort Worth 2002, pet. ref'd).

 The impeachment value of prior crimes involving deception or moral turpitude is greater than
for crimes involving violence. See Theus, 845 S.W.2d at 881; Deleon v. State, 126 S.W.3d 210, 215
(Tex. App.--Houston [1st Dist.] 2003, pet. dism'd). Violent crimes, in contrast, tend to have more
of a prejudicial effect. See Deleon, 126 S.W.3d at 215. Here, certainly, second-degree murder and
aggravated robbery are violent crimes, and their evidentiary value tends to be less than their
prejudicial effect. With that in mind, we conclude that the first factor favors the trial court's
decision.

 We next examine the similarity between the past crime and the offense being prosecuted. 
This Theus factor appears to be more applicable when the witness is the defendant. The concern is
that, when a testifying defendant's past offense is more similar to the one for which he or she is being
tried, the more likely the jury will be to convict the defendant based on his or her pattern of past
criminal conduct, rather than on the evidence of the charged crime. See Theus, 845 S.W.2d at 881. 
Here, the instant case involves charges against Walter alleging capital murder, which necessarily
shares some common elements with the murder and aggravated robbery convictions sought to be
used to impeach Johnson. The similarity between Johnson's prior convictions and the offense for
which Walter was being tried suggest that the evidence of these prior offenses could have a
prejudicial effect on the jury's consideration of the evidence presented against Walter and, instead,
potentially shift blame or suspicion onto witness Johnson. This increased potential for prejudice
weighs in favor of the trial court's decision.

 The final factors concern, respectively, the importance of the testimony at issue and the
importance of the credibility issue. Johnson's testimony regarding what Walter told him does seem
to have a noticeable impact. However, his testimony was not the only evidence against Walter. So,
while Johnson's testimony and, therefore, his credibility, are relatively important here, we note that
Walter did introduce several of Johnson's prior convictions (and several bad acts including perjury,
another possession of a firearm by a felon, destruction of evidence, and failure to register as a sex
offender). Such evidence arguably undermined Johnson's credibility. The State's use of these
several convictions to impeach Johnson diminished the need to use the 1988 robbery and murder
convictions for impeachment and, therefore, reduces their probative value. See Jackson, 11 S.W.3d
at 341 (concluding State "could have relied on appellant's three recent theft convictions to impeach
him" and "other prior convictions drastically lessened the State's need to impeach with the remote
convictions for aggravated rape and a crime against nature"). 

 The trial court did not abuse its discretion in excluding evidence of Johnson's prior second-degree murder and aggravated robbery convictions under these circumstances. Since the value of
convictions for such violent offenses has traditionally been questioned and, here, is less than its
prejudicial effect, and since there was significant other evidence serving to impeach Johnson, we
overrule Walter's point of error.

(3) The Trial Court Did Not Abuse Its Discretion by Changing Venue to Collin County

 On its own motion, the trial court changed venue to Collin County. Article 31.01 governs
the trial court's sua sponte change of venue:

 Whenever in any case of felony or misdemeanor punishable by confinement, the
judge presiding shall be satisfied that a trial, alike fair and impartial to the accused
and to the State, cannot, from any cause, be had in the county in which the case is
pending, he may, upon his own motion, after due notice to accused and the State, and
after hearing evidence thereon, order a change of venue to any county in the judicial
district in which such county is located or in an adjoining district, stating in his order
the grounds for such change of venue. The judge, upon his own motion, after ten
days notice to the parties or their counsel, may order a change of venue to any county
beyond an adjoining district; provided, however, an order changing venue to a county
beyond an adjoining district shall be grounds for reversal if, upon timely contest by
the defendant, the record of the contest affirmatively shows that any county in his
own and the adjoining district is not subject to the same conditions which required
the transfer.


Tex. Code Crim. Proc. Ann. art. 31.01 (Vernon 2006). The trial court complied with the notice
provisions and heard Walter's objections to venue in Collin County. 

 In its notice of intent to change venue, the trial court cited extensive "notoriety and pre-trial
publicity" as grounds for the venue change. Walter does not challenge the trial court's decision to
change venue from Bowie County; he challenges the trial court's decision to change venue to Collin
County. Collin County lies outside any judicial district adjoining the Fifth Judicial District in which
the case was originally filed. He argues that the trial court could and should have transferred the case
to Lamar County, which lies within the Sixth Judicial District and adjoins the Fifth District. Walter
wanted the case transferred to Lamar County because its demographic composition more closely
resembles that of Bowie County in terms of African-American residents. 

 At the hearing and in the briefs, parties discuss both the amount of publicity and the
availability of facilities in Lamar County. Walter presented testimony from a cable television
employee that Lamar County receives channels from the Dallas/Fort Worth-based media, rather than
Texarkana/Shreveport sources. He also presented evidence that only one copy of the Texarkana
Gazette went to Lamar County and that one was sent to the Paris News. Therefore, he argues, he
did show that the high-publicity conditions present in Bowie County which called for a change in
venue were not present in Lamar County. 

 The State presented three articles published in the Paris News the week following the
murders. The article cites the Texarkana Gazette and gave full coverage of the murders. The third
article detailed the charges brought against Walter and Henson, and provided extensive information
concerning how the investigation led to their indictments. Additionally, the State offered the
testimony of Bill Feazell concerning the massive renovation that the Lamar County courthouse was
undergoing at the time. During the renovation, proceedings in Lamar County were being held at the
old post office building and, as a result, courtroom space was very limited for the courts already
there. 

 Noting that Lamar County had practical limitations at the time and that the Fifth Judicial
District Court could not force Lamar County to make appropriate accommodations, the trial court
concluded that the same conditions surrounding the publicity of the murders and the unavailability
of facilities in Lamar County made Collin County the best choice:

 Well, based on the matter that we've discussed, I'm going to overrule the motion. I
do not believe, first of all, that the defendant has established that Lamar County is not
subject to the same conditions that are required to transfer in this case. Based on
State's Exhibit One, it's apparent that Lamar County has also had media publications
regarding this particular case, so I'm not satisfied that the defendant's met his burden
under the statute. But second of all, even if that burden had been met, as a practical
matter, Lamar County simply does not have the facilities available now or for the
foreseeable future in which to try this case, and though it's not a factor that's stated
in the statute, as a practical matter, it simply would have to be something for the
Court to take into consideration. There's just not a place available to try the case. No
matter how much the Court would desire to go there, it just can't be accomplished. 
So for those reasons, I'm going to deny the objection, overrule the objection to the
transfer and this case will proceed onto Collin County.


On appeal, Walter again urges that the publicity in Lamar County did not rise to the level of that in
Bowie County, which made a change in venue appropriate. He also contends that the concerns about
the facilities and security in Lamar County are not valid considerations when the trial court must
decide whether to change venue to a location outside an adjoining judicial district. Therefore, Walter
argues that, in light of his timely contest, the trial court was required to transfer the case to Lamar
County, and that the transfer to Collin County calls for reversal.

 We review a trial court's decision regarding change of venue under Article 31.01 for an abuse
of discretion. See Cook v. State, 667 S.W.2d 520, 522 (Tex. Crim. App. 1984). And we turn our
attention to three cases addressing this matter: Brimage v. State, 918 S.W.2d 466 (Tex. Crim. App.
1996) (op. on reh'g); Aranda v. State, 736 S.W.2d 702 (Tex. Crim. App. 1987); and Bath v. State,
951 S.W.2d 11 (Tex. App.--Corpus Christi 1997, pet. ref'd).

 In Brimage, the Texas Court of Criminal Appeals made clear that the abuse of discretion
standard of review still applied when the trial court changed venue to a location outside an adjoining
judicial district. Brimage, 918 S.W.2d at 508. Brimage involved the trial court's sua sponte transfer
of the capital murder case from Kleburg County to Comal County, a county located outside any
judicial district adjoining the district in which Kleburg County was located, the 105th Judicial
District. Id. at 507. Like Walter, Brimage did not insist on being tried in Kleburg County. Instead,
he argued he could receive a fair trial elsewhere in the 105th Judicial District or in an adjoining
district. Id. at 508. In its highly deferential review, the Brimage court concluded that the trial court
"balanced evidence of possible bias created by significant pretrial publicity in the 105th Judicial
District and surrounding judicial districts with contrary evidence produced by the appellant" to arrive
at its decision and did not abuse its discretion in ordering a change of venue to a county outside an
adjoining district. Id.

 In Aranda, the Texas Court of Criminal Appeals reviewed a trial court's order, on its own
motion, changing venue in a capital murder case from Webb County (in the 49th Judicial District)
to Victoria County (in the 24th Judicial District). Aranda, 736 S.W.2d at 703. In its order, the trial
court concluded a fair and impartial trial "could not be had in Webb County, or other counties in the
49th Judicial District or in any counties adjoining said district" due to massive publicity. Id. at 705. 
The Aranda court noted there was evidence that the offense, the various proceedings, and the
separate trial of Aranda's brother on the same charges were "widely covered" by the media. Id. The
court also pointed out that newspaper articles provided details of Aranda's and his brother's
confessions. Id. From the detailed examination, we note that the nature, not simply the volume, of
the publicity, is relevant to the trial court's decision to change venue to a county beyond an adjoining
district. Again, we note the highly deferential review of the trial court's decision "in passing upon
the question of a change of venue": "When there is conflicting evidence on the issue, a court's
decision regarding change of venue will not normally be considered an abuse of discretion." Id.

 Another transfer from Webb County was at issue in Bath. After considering evidence on the
publicity in Webb and surrounding counties, and evidence of the ability of those surrounding
counties "to provide the facilities, personnel, or security," the trial court first transferred the pending
capital murder case to Bexar County, a county beyond an adjoining judicial district:

 Simply stated, I question whether Webb County could visit on one of the rural, small
counties, the task of trying a capital murder case. Not because of the nature of this
case or because of the dangerousness of anyone or the danger to the witnesses or the
defendant, the Sheriff's departments to handle the traffic and just the matter of
security that goes with this type of trial. Not having heard any evidence as to why it
should go into one [of] these adjoining counties, even though some evidence was
presented concerning the ability of the different Sheriff's departments. My own
experience in Zapata tells me that it is indeed a very, very difficult task to select the
jury and try the case and provide adequate security for all concerned.


Bath, 951 S.W.2d at 21-22. When Bexar County could not provide "a timely courtroom," the trial
court transferred the case to Nueces County (in the 28th Judicial District), beyond an adjoining
judicial district. 

 Bath argued the record failed to show cause for changing venue to a location beyond an
adjoining judicial district. Id. at 21. To that, the Corpus Christi court of appeals responded that
"valid concerns necessitated the transfer of the case to a county in a non-adjoining judicial district." 
The court went on to conclude, in language mirroring Article 31.01, that the record showed all
counties in the adjoining judicial district were subject to the same conditions that necessitated a
transfer. Id. at 22. While there was substantial evidence regarding the level of publicity in
surrounding counties, it is important to note that the trial court also heard a good amount of evidence
on the capacity of those counties to handle a capital murder case in terms of facilities and security. 
The Corpus Christi court labeled these considerations as "valid concerns." Id.

 Here, we see evidence both supporting and undermining the position that Lamar County was
not subject to the same conditions that called for a transfer of the case from Bowie County. In light
of this conflicting evidence on the nature and extent of publicity in Lamar County, we hold that the
trial court did not abuse its discretion by changing venue to Collin County. We add that the trial
court's consideration of other, practical concerns is consistent with Texas law. The Corpus Christi
court in Bath upheld the trial court's decision to change venue to a county beyond an adjoining
district when the trial court heard conflicting evidence on the issue of publicity and evidence that
potential locations, regardless of publicity concerns, were not equipped to undertake a capital murder
trial. See id. The Texas Court of Criminal Appeals refused Bath's petition for discretionary review,
and the United States Supreme Court denied Bath's petition for writ of certiorari, suggesting that the
Corpus Christi court's reasoning in Bath was sound. Indeed, the trial court is given a considerable
amount of discretion on issues of venue. With that in mind, we also expressly reject Walter's
argument that the trial court's consideration of the practical limitations present in Lamar County
during the time were irrelevant.

(4) The Trial Court Did Not Err by Denying Walter's Motion to Quash Indictment

 Walter contends the trial court erred by denying his motion to quash the indictment, urged
on the basis that unauthorized persons were present during the grand jury proceedings. See Tex.
Code Crim. Proc. Ann. art. 20.011(a) (Vernon 2006). We emphasize that, here, no unauthorized
persons were present during grand jury deliberations. See Tex. Code Crim. Proc. Ann. art.
20.011(b) (Vernon 2006).

 The State stipulated to the presence of several Texarkana police officers during grand jury
testimony. None of these officers testified before the grand jury, and only a few testified at trial. 
The State argued at trial, as it does in its appellate brief, that Article 20.011(a)(4) relating to
witnesses allows for the presence of potential witnesses at trial as well as witnesses before the grand
jury. (7) We disagree with this interpretation; since the State stipulated to the presence of officers who
were not witnesses before the grand jury, the record supports the conclusion that the State violated
Article 20.011.

 (a) Historical Perspective

 Traditionally, Texas cases have consistently maintained the distinction between presence
during grand jury testimony and presence during grand jury deliberations. See Ex parte Rogers, 640
S.W.2d 921, 924 (Tex. Crim. App. 1982); Ray v. State, 561 S.W.2d 480, 481 (Tex. Crim. App.
1977); Hernandez v. State, 791 S.W.2d 301, 305 (Tex. App.--Corpus Christi 1990, pet. ref'd). 

 In one of the early decisions concerning the presence of unauthorized people in the grand jury
room during testimony, a sheriff accompanied the young, female complainant into the grand jury
room. See Tinker v. State, 95 Tex. Crim. 143, 253 S.W. 531, 532 (1923). The sheriff remained
present while she was being questioned. Id. The Texas Court of Criminal Appeals pointed out that
no one was present while the grand jury deliberated:

 This court has held, in regard to the presence of persons acting in various capacities
during the investigation of crime, that such presence, extending no further than while
testimony was being had before the grand jury, would not come within the
forbiddance of such presence while the said grand jury was deliberating upon the
finding of the indictment.


Id. (citing Moody v. State, 57 Tex. Crim. 76, 121 S.W. 1117 (1909); McElroy v. State, 49 Tex. Crim.
604, 95 S.W. 539 (1906)). 

 In Minton v. State, detectives, other than the one detective who testified before the grand
jury, were present in the grand jury room to hear testimony. 468 S.W.2d 426, 432 (Tex. Crim. App.
1971). The detective who did testify remained in the room "to coordinate the testimony of the
witnesses." Id. Again, the court pointed out that the detectives were not present during grand jury
deliberations and concluded there was no error:

 The Texas rule is that "when the jurors are not deliberating or voting the presence of
persons who have official business in the jury chamber, such as police officers or
stenographers, is not discountenanced." 27 Tex. Jur.2d 261, Sec. 44. See: Lopez v.
State, 158 Tex. Crim. 16, 252 S.W.2d 701; Tinker v. State, 95 Tex. Crim. 143, 253
S.W. 531.


 However, better practice would dictate that only the prosecutor, reporter, if any, and
such witnesses that are testifying be present.

Id. (emphasis added). (8) "Discountenance" is "to treat or regard with disfavor." Webster's II New
College Dictionary (2d ed. 2001).

 (b) Codification of the "Better Practice" Rule

 If the presence of unauthorized people during grand jury testimony was not disfavored, it
became at least somewhat more disfavored in 1995 when the Legislature passed Article 20.011,
effectively codifying what had historically been deemed "the better practice." Again, no cases
construe or apply Article 20.011. We must apply the plain language of Articles 20.011 and 27.03
to determine whether there is no error when unauthorized people are in the grand jury room during
testimony.


 (c) Construction of Articles 20.011 and 27.03

 Article 20.011 of the Texas Code of Criminal Procedure became effective September 1,
1995, and limits who may be present during both grand jury proceedings and grand jury
deliberations:

 (a) Only the following persons may be present in a grand jury room while the grand
jury is conducting proceedings:


 (1) grand jurors;

 (2) bailiffs;

 (3) the attorney representing the state;

 (4) witnesses while being examined or when necessary to assist the attorney
representing the state in examining other witnesses or presenting evidence to
the grand jury;

 (5) interpreters, if necessary; and

 (6) a stenographer or person operating an electronic recording device, as
provided by Article 20.012.

 

 (b) Only a grand juror may be in a grand jury room while the grand jury is
deliberating.


Tex. Code Crim. Proc. Ann. art. 20.011 (Vernon 2006). Notably absent in Article 20.011 is a
specific remedy for a violation of the rule. It is also quite significant that Article 20.011 addresses
the presence of unauthorized persons both in grand jury proceedings and in grand jury deliberations.

 Article 27.03 specifically provides circumstances in which an indictment may be set aside:

 In addition to any other grounds authorized by law, a motion to set aside an
indictment or information may be based on the following:


 1. That it appears by the records of the court that the indictment was not found by
at least nine grand jurors, or that the information was not based upon a valid
complaint;


 2. That some person not authorized by law was present when the grand jury was
deliberating upon the accusation against the defendant, or was voting upon the
same; and


 3. That the grand jury was illegally impaneled; provided, however, in order to raise
such question on motion to set aside the indictment, the defendant must show that he
did not have an opportunity to challenge the array at the time the grand jury was
impaneled.


Tex. Code Crim. Proc. Ann. art. 27.03 (Vernon 2006) (emphasis added). We note that Article
27.03 refers to the presence of unauthorized persons during grand jury deliberations only. So, the
presence of unauthorized persons during grand jury testimony can be a basis for setting aside the
indictment only if Article 20.011 serves as authority to do so. That is, only if Article 20.011's list
of authorized persons would qualify as "other grounds authorized by law" under Article 27.03, may
Walter seek to set aside the indictment on the basis that unauthorized persons were present during
testimony before the grand jury. We conclude that Article 20.011 does not authorize an indictment
to be set aside on the ground that unauthorized persons were present during grand jury testimony.

 (d) Article 20.011 Does Not Authorize Setting Aside the Indictment Based on Presence
of Unauthorized Persons During Grand Jury Testimony


 It is a well-settled rule of statutory construction not to interpret laws in such a way as to
render useless an act of the Legislature. We, therefore, presume that, in enacting legislation, the
Legislature did not do a "useless thing." See Childress v. State, 784 S.W.2d 361, 364 (Tex. Crim.
App. 1990); Heckert v. State, 612 S.W.2d 549, 552 (Tex. Crim. App. 1981); see also Tex. Gov't
Code Ann. § 311.021(2) (Vernon 2005) (providing "it is presumed that the entire statute is intended
to be effective"). Generally, courts are also to presume that every word in a statute has been used
for a purpose and each word, phrase, clause, and sentence should be given effect if reasonably
possible. State v. Hardy, 963 S.W.2d 516, 520 (Tex. Crim. App. 1997); State v. Verhoeven, 151
S.W.3d 637, 640 (Tex. App.-- Fort Worth 2004, pet. ref'd). To achieve this, we must focus "on the
literal text of the statute in question and attempt to discern the fair, objective meaning of that text
at the time of its enactment." See Ex parte Spann, 132 S.W.3d 390, 393 (Tex. Crim. App. 2004);
Boykin v. State, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991). In doing so, we may consider, among
other things, "common law or former statutory provisions, including laws on the same or similar
subjects." See Tex. Gov't Code Ann. § 311.023(4) (Vernon 2005).

 We apply these rules of statutory construction to determine whether Article 20.011 calls for
an indictment to be set aside when the record shows that unauthorized persons were present during
the grand jury testimony. To determine this issue, we return to our earlier observation regarding
Article 20.011: while Article 20.011 forbids unauthorized persons to be present with a grand jury
during both testimony and deliberations, it does not specify a remedy for either situation. See Tex.
Code Crim. Proc. Ann. art. 20.011.

 That said, we also re-examine what Article 27.03 does and does not do. Article 27.03
provides that an information or indictment may be set aside when unauthorized persons have been
present during grand jury deliberations, but it makes no reference at all to the presence of
unauthorized persons during grand jury testimony. In other words, Article 27.03 provides a specific
remedy, but with respect to only the deliberations, not the testimony, referenced in Article 20.011. 
See Tex. Code Crim. Proc. Ann. art. 27.03(2). Therefore, treating Article 20.011's proscriptions
as providing "other grounds authorized by law," to set aside an information or indictment, would
necessarily render Article 27.03(2)--specifically providing a remedy for unauthorized presence
during grand jury deliberations--an unnecessary repetition of what Article 20.011 could accomplish
as "other grounds." Article 27.03(2) simply would not be necessary if Article 20.011 authorized
setting aside the indictment for unauthorized presence during grand jury testimony and deliberations.

 To further illustrate, it is helpful to first reconcile the two articles with respect to grand jury
deliberations. Article 20.011(b) identifies who may be present during grand jury deliberations--only
grand jurors. Article 27.03(2) then authorizes the trial court to set aside an indictment if a defendant
shows that unauthorized persons were present during those deliberations. Similarly, Article
20.011(a) identifies who may be present during testimony before the grand jury. However, there is
no specific provision authorizing setting aside the indictment on that basis. The "any other grounds"
language cannot be used because, again, to do so would render Article 27.03(2) useless and
redundant.

 In order to accept Walter's position, we would have to treat Article 27.03(2) as a redundant
provision. We are bound by rules of statutory construction not to interpret legislation in such a
manner as to render a provision useless. See Fearance v. State, 771 S.W.2d 486, 522 (Tex. Crim.
App. 1988) (enactment of redundant legislation a "useless thing"). We cannot conclude Article
20.011, as "other grounds" does, in part, what Article 27.03(2) does specifically. To do so would
make Article 27.03(2) unnecessary. Therefore, Article 20.011 does not authorize the setting aside
of the indictment on the basis that unauthorized persons were present during grand jury testimony. (9)

(5) The Trial Court Did Not Abuse Its Discretion by Granting the State's Challenges for Cause

 

 Walter complains the trial court erroneously granted the State's challenges for cause regarding
five jurors who indicated they would hold the State to a standard of proof higher than beyond a
reasonable doubt. (10)

 It is left to the discretion of the trial court to first determine whether bias exists. Anderson
v. State, 633 S.W.2d 851, 854 (Tex. Crim. App. 1982). An erroneous decision by a trial court to
grant the State's challenge for cause will result in a reversal of the conviction only if the appellant
can show that he or she was deprived of a lawfully constituted jury as a result of the trial court's
action. See Feldman v. State, 71 S.W.3d 738, 749 (Tex. Crim. App. 2002); Jones v. State, 982
S.W.2d 386, 394 (Tex. Crim. App. 1998).

 A challenge for cause may be made by the State if a juror has a bias or prejudice against any
phase of the law on which the State is entitled to rely for conviction or punishment. Tex. Code
Crim. Proc. Ann. art. 35.16(b)(3) (Vernon 2006). Bias is an inclination toward one side of an issue
that leads to a natural inference that the juror will not act with impartiality; prejudice is prejudgment. 
See Anderson, 633 S.W.2d at 853. When a juror indicates this type of bias as a matter of law, he or
she must be excused despite any protestations by the juror of an ability to set the bias aside and be
fair and impartial. See Clark v. State, 717 S.W.2d 910, 917 (Tex. Crim. App. 1986); Anderson, 633
S.W.2d at 854; Mize v. State, 754 S.W.2d 732, 742 (Tex. App.--Corpus Christi 1988, pet. ref'd).

 Here, five prospective jurors--those assigned numbers 44, 45, 53, 127, and 154--indicated
that, when faced with the facts of a case in which the State seeks the death penalty, he or she would
hold the State to a standard of proof higher than beyond a reasonable doubt. For instance, Juror 44
explained that he would have to be "absolutely sure without any doubt" in a death penalty case. 
Jurors 45 and 127 were, initially, less emphatic than the others and, on the defense's request, the trial
court spoke with those two individually regarding their positions on the standard of proof. Both
jurors clarified that they could not hold the State to the beyond-a-reasonable-doubt standard, that the
State would have to prove its case more convincingly. None of the challenged jurors ever wavered
on his or her position by trying to state that he or she could put aside his or her personal position and
follow the law. Each consistently indicated that they would have to be convinced by a standard
higher than the beyond-a-reasonable-doubt standard. 

 Therefore, we conclude that the trial court did not abuse its discretion by determining that
these five jurors were biased against the law to be applied in this case. Based on the rule in
Anderson and Clark that a juror who has demonstrated bias as a matter of law must be excused, we
conclude the trial court properly granted the State's challenges for cause and overrule Walter's point
of error.

(6) The Trial Court Did Not Err by Refusing to Include an Aggravated Robbery Instruction

 A  defendant  is  entitled  to  the  submission  of  a  lesser  offense  if  a  two-pronged  test
is met: (1) the lesser-included offense must be included within the proof necessary to establish the
offense charged, and (2) some evidence must exist in the record that would permit a jury rationally
to find that, if the defendant is guilty, he or she is guilty only of the lesser offense. See Solomon v.
State, 49 S.W.3d 356, 368-69 (Tex. Crim. App. 2001).

 Pursuant to Section 19.03(a)(7)(A) of the Texas Penal Code, the State alleged that Walter

 did unlawfully then and there intentionally cause the death of an individual, Chrystal
Willis by shooting Chrystal Willis with a firearm and did then and there intentionally
cause the death of an individual, Rebecca Shifflett by shooting Rebecca Shifflett with
a firearm and did then and there intentionally cause the death of an individual,
Matthew Hines by shooting Matthew Hines with a firearm and all murders were
committed during the same criminal transaction.


That is, the State characterized the offense as capital murder by virtue of there being three victims
murdered in the same criminal transaction. While the State may have charged Walter with capital
murder by alleging that he committed murder in the course of committing aggravated robbery, it did
not do so. See Tex. Penal Code Ann. § 19.03(a)(2) (Vernon Supp. 2006). Nevertheless, Walter
argues that the trial court erred by refusing to include his requested instruction on aggravated
robbery.

 Aggravated robbery is not included within the proof necessary to establish that Walter
murdered three people in one criminal transaction. Further, even if the first prong were satisfied, we
note that there is no evidence that, if Walter is guilty, he is guilty only of aggravated robbery. While
Walter denied having shot the victims, he also denied having gone to the restaurant at all that night. 
Therefore, his testimony does not suggest that, if he is guilty, he is guilty only of aggravated robbery. 
No other evidence in the record suggests that Walter did not shoot the three victims. 

 Walter cites Broussard v. State to support his position. 642 S.W.2d 171, 173 (Tex. Crim.
App. 1982). However, we distinguish Broussard by pointing out that the State in Broussard had
alleged capital murder as murder during the commission of robbery. Id. Such is not the case here;
Broussard is inapplicable to these facts. The trial court did not err by refusing to include a charge
on aggravated robbery.

 Having overruled all of Walter's points of error, we affirm the trial court's judgment.


 Josh R. Morriss, III

 Chief Justice


Date Submitted: August 10, 2006

Date Decided: November 15, 2006


Publish
1. Walter began working at the Outback Steakhouse in September 2001 and was, by most
accounts, a problem employee, having been fired by at least one manager, and perhaps by another
prior manager as well. New general manager Matthew Hines decided to give him another chance,
but he also fired Walter August 5, 2003, after continued problems. Since then, Walter had been
working at Tyson Chicken and staying with a female friend in nearby Hope, Arkansas. He came to
Texarkana to attend his sister's weekly party where he connected with Henson at some point. 
Henson, also, had been fired from Outback some months earlier. Walter and Henson planned to rob
the restaurant. They left together in a Chevrolet Blazer that Walter had been borrowing from his
sister. The two gained entry to the restaurant through a side door known by all of the employees to
be defective. 
2. Johnson testified that a very serious and nervous Walter admitted committing the robbery
and shooting three people at the restaurant. Walter explained that Henson was with him at the
restaurant. In response, Johnson advised Walter that Walter should have killed Henson, also, to
ensure that Henson would not talk. 

 Johnson testified that, earlier on August 31, he had loaned Walter the loaded Lorcin semi-automatic .380 caliber handgun used in the murders. He testified that Walter asked him for the gun
and left Johnson with the impression that he wanted the gun as protection against crime in his
neighborhood. Later that day, Walter returned to Johnson and mentioned "do[ing] Outback." 
Johnson did not take the comment seriously until Walter returned a second time and continued to
talk about robbing the Outback Steakhouse with the gun. Johnson then attempted to dissuade Walter
from that idea and suggested Walter return the gun to Johnson. Walter did not return the gun.

 Johnson further testified that, after Walter was arrested for the murders, Walter's
mother--Johnson claims her as his mother-in-law--found the gun at Walter's apartment and
destroyed it. Johnson also admitted that he initially perjured himself before the grand jury by
attempting to provide an alibi for Walter, but that later he agreed to cooperate when the State agreed
it would not pursue perjury or other charges against Johnson if he would testify in this case.
3. Roderick was familiar with Walter and testified that Henson and Walter were acquaintances. 
Roderick further testified that, the morning following the murders, a nervous Henson told him about
the events. Before Roderick heard anything about the murders, Henson told him that Walter and
Henson had planned on "hit[ting] a lick," slang for committing a robbery, at the Outback Steakhouse. 
Henson explained to Roderick in their private conversation that Walter went into the back office,
came out with a bag of money, and went back to the office to perhaps get keys to the safe. As
Henson waited in the hallway, he heard voices pleading with Walter not to shoot and then heard six
gunshots. Henson and Walter left in Walter's vehicle and split the money, amounting to
approximately $400.00 each. Fearing that cameras may have filmed the two as they left the
restaurant, Henson enlisted the help of Roderick to burn the clothing Henson wore that night. Later,
Roderick suggested to Henson that he turn himself in and, after Roderick began fearing that he was
becoming too involved himself, had his wife call the police and relay the information he had learned
from Henson. 
4. The United States Supreme Court added the following distinction:


 Statements are nontestimonial when made in the course of police interrogation under
circumstances objectively indicating that the primary purpose of the interrogation is
to enable police assistance to meet an ongoing emergency. They are testimonial
when the circumstances objectively indicate that there is no such ongoing emergency,
and that the primary purpose of the interrogation is to establish or prove past events
potentially relevant to later criminal prosecution.


Davis, 126 S.Ct. at 2273-74.
5. A person commits criminal conspiracy if, with intent that a felony be committed, he or she
agrees with one or more persons that they or one or more of them engage in conduct that would
constitute the offense. See Tex. Penal Code Ann. § 15.02(a)(1) (Vernon 2003); Cienfuegos v.
State, 113 S.W.3d 481, 489-90 (Tex. App.--Houston [1st Dist.] 2003, pet. ref'd).
6. In 1986, Johnson was convicted of sexual assault and placed on probation. This probation
was revoked in 1988 when Johnson was convicted for robbery and murder and sentenced to ten
years' confinement. Johnson was paroled in 1992 only to return to prison months later after being
convicted of possession of a controlled substance and possession of a firearm by a felon. For these
1993 convictions, he was sentenced to three years' confinement, to run concurrently with the
remaining sentence from the 1988 convictions. Johnson was again paroled in 1995 and remained
on parole until November 15, 2000. So, the record indicates that Johnson was not released from
confinement for the 1988 convictions until either 1995 when he was paroled or 2000 when he was
released from parole. See Tex. Gov't Code Ann. § 508.001(6) (Vernon 2004) (describing parole
as a "discretionary and conditional release" that allows an inmate to "serve the remainder of the
inmate's sentence under the supervision of the pardons and paroles division" and suggesting that
parole is not a release from confinement for purposes of Rule 609 of the Texas Rules of Evidence). 
Under either calculation, the 1988 convictions were not remote convictions to be evaluated under
the stricter "substantially outweigh" standard of Rule 609(b). Further, the 1993 convictions for
possession of a controlled substance and possession of a firearm by a felon represent intervening
felonies which would vitiate the remoteness of any prior convictions and place the older convictions
back under the "outweigh" standard of Rule 609(a). See Jackson v. State, 11 S.W.3d 336, 339 (Tex.
App.--Houston [1st Dist.] 1999, pet. ref'd); Hernandez v. State, 976 S.W.2d 753, 755 (Tex.
App.--Houston [1st Dist.] 1998, pet. ref'd). 

7. Had the State attended oral argument at this Court's invitation, it may have more thoroughly
explained its interpretation of Article 20.011(a).
8. See also Baldwin v. State, 478 S.W.2d 476, 478 (Tex. Crim. App. 1972) (citing long-
standing rule such presence "not discountenanced" and concluding no reversible error shown);
Harris v. State, 450 S.W.2d 629, 630 (Tex. Crim. App. 1970) (holding Article 27.03(2), authorizing
dismissal based on presence of unauthorized people during deliberations, means more than "mere
examination of witnesses").
9. Nor does it serve as a basis for setting aside the indictment because unauthorized persons
were present during the grand jury's deliberations; Article 27.03(2) plainly does that.
10. In the same analysis, Walter also argues that the trial court erred by refusing to submit a
definition of reasonable doubt in the jury charge. We can readily dispose of that issue, however. 
The Texas Court of Criminal Appeals has specifically held that a "reasonable doubt" definition is
not required. See Paulson v. State, 28 S.W.3d 570, 573 (Tex. Crim. App. 2000). We applied
Paulson in Rogers v. State, 85 S.W.3d 359, 362 (Tex. App.--Texarkana 2002, no pet.).